My partner, Paul D. Filippo, just stepped out. Oh, he expected a shorter or a longer break. He's here. Okay, well, we'll just pause for a moment then. Thank you, Your Honor. Sure. May it please the Court, Paul D. Filippo for Lehman Brothers Special Financing, plaintiff and appellant. Both of the lower courts, Your Honor, applied Section 560 of the Bankruptcy Code to dispose of all of Lehman's claims, which Lehman's submit was error. The district court affirmed solely on the grounds of Section 560 based on the bankruptcy court's analysis and did not address any of the other issues that we challenge as part of the bankruptcy court's decision. Those are the Type 1 and Type 2 modification distinction and the timing of the modifications. Your review of the bankruptcy court is de novo. And if you'll permit me, I would begin with the Section 560 argument. The bankruptcy court did not have the benefit of merit management when it ruled, which changed the rules of the game with respect to the application of safe harbors. Now in deciding whether a swap is applicable to a transaction, you focus on the conduct which is challenged rather than the entire transaction, as the bankruptcy court did, because that used to be the law in this circuit under Tribune. So merit didn't change the plain meaning rule, right? And both the district court and the bankruptcy court determined as part of their analysis that the word liquidation includes the distribution of the proceeds. So this report doesn't change that basic rule, right? When they analyzed the dictionaries, general and financial, and made that conclusion, what was erroneous about that? What was erroneous, Your Honor, is that you have to look at the rights, the contractual rights of the only swap participant in this case, which is the issuer. The trustees are neither swap participants nor financial participants.  There's several parts to the analysis. The first part is whether liquidation of the word includes distribution of proceeds. Yes, Your Honor. That part of the analysis, right? Yes, Your Honor. And the issuer has no right to distribute the collateral under the transaction documents. Whether or not liquidation includes payment is really irrelevant to the discussion because once the swaps were liquidated, there was nothing to distribute. There was no proceeds generated from liquidation of the swaps. All of the money was generated under the indentures. So the trustees distributed the proceeds, not the issuers, and that is where the Bankruptcy Court made its error. They were acting together, the Bankruptcy Court. So they were part and parcel of the same, you know, transaction. The district court, we, the Bankruptcy Court, cited to the indenture standard terms 10.1D, which makes reference to the issuer and the trustee shall take actions to enforce the rights of the issuer and the trustee and shall apply the proceeds of any such action to principal collection. So it's clear that these are rights of the issuer, right? The issuer holds the rights of the trustees assisting on the distribution of the proceeds. Your Honor, I must respectfully disagree. 10.1D says that the issuer shall enforce the swap. It does not say the issuer shall enforce the indenture. The issuer shall enforce the swap only, and there is nothing in the swap that says the issuer distributes the collateral. There is nothing in the swap that says the issuer makes payments. The swap makes reference to subject to the priority payments set forth in the indentures, right? Well, Your Honor, let's talk about that because subject to, as all the cases say, is an ambiguous term with several potential meanings. And if you look at its placement, it is in both 5.1 of the schedule and 12.16 of the indenture, and both of those provisions deal with the limited recourse of the issuer once the collateral is exhausted. In other words, there are no more claims possible against the issuer. And look at the placement of the terms subject to the priority provisions. It's at the end of the limited recourse language. Now, what does it mean? It doesn't really belong there because it is inconsistent with the intent of the provisions in which it appears to immunize the issuer from further liability once the collateral is exhausted. What would be the point of making the issuer's lack of liability subject to anything? The issuer is a special purpose entity with no assets. Once the collateral is exhausted, it has nothing else left to pay with. It is off the hook. So the placement of that clause is extremely ambiguous, nor is it effective to incorporate the swaps by reference. When the parties wanted to incorporate the indentures by reference into the swaps, they knew how to do so because in the racers' deals, they did exactly that. They incorporated mutatis mutandi, I think is the term, entirely into the swap. I don't understand what's ambiguous. If I say I'm going to pay you something for this schedule, what's ambiguous that I want to incorporate that schedule into the payment? Why is that ambiguous? I don't understand that. It doesn't say that, Your Honor. It says the issuer's liability is subject to the priority of payments. It's set out in the indenture, right? Right. It's referencing the indenture and the priority payments that are set out there. So I don't understand why what's ambiguous that they want to incorporate. Well, does that mean that if the trustee misapplies the indenture and misdirects the collateral when it makes payments, the issuer is not relieved of liability? Because the subject, too, could mean contingent upon, it could mean regulated by, it could mean any number of different things, and it's not effective to incorporate the language of the indenture into that swap. That is our point on that, Your Honor. What are you saying it actually means? I'm having the same trouble as Judge Bianco. Subject in any case to the priority of payments set out in the indenture. What's your interpretation of that? I don't think it belongs there at all. I think it's a mistake in drafting. And it's not unusual in complex structured financings like this for there to be just stray words and a number of mistakes in drafting. So this language does not belong in its context, which is to relieve the issuers of liability. What is the point of making their relief subject to anything? You would agree that we should look for a meaning for it before we start it as a criminal's error. Yes, Your Honor, but if it's ambiguous, it is error to construe it against us on a motion to dismiss. You can look for a meaning, but it's very difficult to find one. This was a motion to dismiss. No evidence was submitted. We don't have any record. And that's part of the problem with the bankruptcy court's holding. What about the separate argument that both the swap agreement and indentures are part of, you know, are integral to each other? They're an integrated document. There's numerous references in the, I think the amicus brief said there's 41, I mean 21 references to the indentures in the swap schedule. Incorporates definitions from the indentures that aren't otherwise defined in the swap schedule. And obviously an event of default under one triggering an event of default under the other. So why aren't they all part of a CDO, right? Does it make any sense to separate them the way you're suggesting? Your Honor, the question is whether the indenture is a swap agreement, not whether the documents should be read together as part of an integrated transaction. If the indenture is not a swap agreement, then the trustees. It could be a swap agreement, right? It could be a security agreement related to a swap agreement, right? But the statutory definition requires a limitation on that solely to damages recoverable under 562. So if you look at 101-53-B-A-6, you will see that it says limited to the damages recoverable under 562 when you incorporate a swap, an indenture into a swap. And there are no damages recoverable under 562 in this record. In your brief, you say that the lower courts were wrong to collapse the numerous steps from the swap termination to collateral distribution into a single process. I was having difficulty understanding why those ought to be conceived of as numerous separate steps. It seems to me distribution is part of liquidation in the ordinary meaning, although liquidation can mean to liquidate damages to calculate. But in this context, it seemed to me that it's meaningless unless you include distribution as part of the process. Why is that mistaken? That gets us back to Judge Bianco's question at the beginning, which is we don't abandon the plain meaning rule under merit. We continue to apply it. So I would go back to the language of the statute, which says the only thing that's protected is the exercise of a contractual right of a swap participant or financial participant. And the only swap participant or financial participant on this record were the issuers. It says a contractual right of the swap participant. Of, yes. Leaving open the possibility that another individual properly authorized could exercise those rights. Yes, but there's no such authorization for the issuers. There is no right of the issuers under any of these documents to liquidate the collateral and pay the proceeds out to the note holders. Nowhere in the transaction documents. They don't exercise their rights to cause the liquidation. That obviously is the key aspect, right? The trustees are the only ones that have a right to do that, Your Honor, and they don't have protected rights under 560. Trustees can't terminate. The issuer terminates, right? The trustee is just distributing the funds. It's the issuer who terminates and causes the liquidation, right? Termination and liquidation happen under the swap. Liquidation is the calculation. Whose right is that, though? Whose right is it to terminate? Is it the trustee's right to terminate or is it the issuer's right to terminate? It's the issuer's right to terminate on default. Termination ends the transactions under the swaps. Then you liquidate the amount due to either party. Under second method, that liquidation caused Lehman to be owed $3 billion on the termination of these transactions, which it lost solely because of the bankruptcy of its parent, a classic ipso facto clause. It does not ñ nothing in the swap, which is the only source of the issuer's rights, allows the issuer to distribute the collateral. There is no right there that is protected by 560. I think I see the red lights on. I think we have an argument. Of course, we have your first ñ do you want to make ñ Well, yes, Your Honor. Do you have two minutes for rebuttal? Do you want to use that time now or ñ No, Your Honor. I have another minute and a half or so here, I think. Oh, the red light is on. Oh, I apologize. I'll sit down. Okay. Very good. We'll hear from Mr. Boccuzzi. Thank you, Your Honors. I may please the Court. My name is Carmine Boccuzzi from Cleary Gottlieb, and I'm speaking on behalf of the FLEs. The district court was correct in affirming the bankruptcy court's thorough 51-page decision that dismissed LBSF's claims, given the plain language of the Section 560 Safe Harbor. The district court did not reach, although we raised those as alternative and additional grounds for affirmance, two other grounds and basis for dismissing the claims. I'd like to start with the Section 560 Safe Harbor. The district court had the advantage of having the merit management case before it. The case was decided while the appeal of the bankruptcy court order was pending, and the district court applied the exact rationale of merit management in reading the plain language, just as the bankruptcy court had, and applying it to the circumstances here. That language, which you heard from my adversary, talks about the contractual right of a swap counterparty to cause the liquidation of a swap, and that's exactly what happened here. And the Black's Law Dictionary definition that we cite, Merriam-Webster, the district court cited it. It's in our brief at 25 and 26. That makes clear we're clearly in the heartland of liquidation, which is settling the claim and paying it out. Those are all rights of the issuer. The issuer, if you look at the is the master, which is in the record, and you can find it at 1310 in the joint appendix, Section 5A gives the right to call the event of default. 6A allows for termination. And then you go into the schedule, and the schedule is very clearly, the schedule, no one disputes, the schedule is part of the swap agreement. The schedule, as Judge Bianco said, is loaded with references to the indenture. It starts right at the top saying, anything not defined here, look to the indenture. The nonrecourse provision, which is a right of the issuer, specifically states that it's obligations to pay. My adversary said liability. It uses the word payment. All amounts payable to be paid by the issuer under the swap agreement, the sole recourse is to the collateral, subject to the priority provisions in the indenture. So those provisions are specifically referenced in the schedule. And I would also note, while they try to separate out the indenture, with no basis in the record, the provision before that in the schedule is specifically called indenture. And it says the issuer agrees it won't enter into any other indentures without their approval, and specifically indentures that could affect the priority of payments. So these provisions were central to the liquidation of the swap. And I would add, I think we would win if the statute just said termination, because all this flowed from the issuer's right, the contractual right to cause the termination of the swap, but Congress added in the word liquidation to make it absolutely clear that this was covered. Liquidation does have several different meanings. The district court said, though, that to adopt LBSF's proposed definition would be nonsensical. Why is that so? Because it's clear that this safe harbor is meant to protect the closing out and the settling of the swap. And under Lehman's position, they say, well, you just calculate, and that's what's safe harbored. And then what? The money just sits there? This is all about payment out and closing this out. And we know that because if you keep reading in Section 560, they go on to cover as well any rights to set off or netting of payments. So the statute itself is talking out about payment. The concept of payment is included in the plain definition of liquidation, and then it's further explicated. So clearly this is about peace from avoidance actions and the kind of challenges that we're seeing here, specifically ipso facto claims and safe harboring them under the statute. And so I think the Court was right to say, apply the plain language, let me hear their arguments. Their arguments lead to an absurd result that's not otherwise supported by the plain language of the safe harbor. And I would also point the Court to the Michigan housing case decided by Judge Peck, another Lehman case where they said liquidation has got to cover the method of liquidation. And clearly the payment priority provisions in the indenture incorporated by reference, and there's no ambiguity about the word subject to what that means in the schedule, is the method of how the parties all agreed going into this liquidation would proceed. And that was the right of the issuer as swap counterparty. We also had two other bases, Your Honors, for affirming the bankruptcy court decision and an alternative and additional grounds for affirming the district court. Number one, there is no modification that occurred in the so-called type two transactions. If you think about an ipso facto provision, and the Queens Boulevard case talks about the classic one and it's in the ipso facto, anti-ipso facto provisions talking about a lease, on day one before bankruptcy, someone has the right to occupy an apartment or a commercial space. They go into bankruptcy, there's something in the lease that says, now you get out. Their right to occupancy was modified by the fact of that bankruptcy filing. Here, Lehman did not. We've heard different versions in the briefing about the so-called right that was modified. They say they had an in-the-money position. But on September 12th, the last business day, 2008, before they went into bankruptcy, they had no right to monetize or claim that quote in-the-money position. They also had no priority at that time. They say they lost their place in line. There was no line on September 12th. On September 15th, when LBHI goes into bankruptcy, then you had the termination of the swap by the issuer, which had granted all of its rights to enforce the swap and the indentures to the trustee, including its obligations under the swap agreement. And then there was an event of default, and no one challenges, it's agreed, it's common ground that this was properly terminated and that's safe harbored clearly. And at that point, you determine the priorities. So nothing was changed as a result, or no contractual right of LBSF was changed pursuant to these Type 2 provisions. And then the second point is, of course, the plain language of the anti-ipso facto provisions in the statute. They specifically talk about a contractual right of the debtor that is changed at any time after the commencement of the case. The debtor we are talking about is LBSF. So you have to think about LBSF as the debtor and the LBSF bankruptcy as the case. None of that existed until October 3rd, weeks after the September 15 filing of LBHI. So the issue here is that the 365E1 anti-ipso facto provision, and there's parallel language of that in each of the other sections that rely on Section 541C1, talks about the debtor and the commencement of the case. That meant even if there was a modification of the rights, and we disagree with that, the bankruptcy court disagreed with that, it didn't happen after the commencement of the LBSF case. It happened after the LBHI. That's not the debtor. That's not the case for purposes of these statutes. They point to 363L because it doesn't have that language, and it talks about a case. And so they think that undoes this. Section 363L starts specifically with a subject to the provisions of Section 365, which, of course, talks about the debtor and the case. And also if we, and they rely heavily for the 363L reading on the idea of concerning the debtor, that even though LBHI was in our debtor, LBSF, the LBHI filing concerned LBSF. But the definition of a debtor in the Bankruptcy Code, I believe it's Section 101 sub 13, defines a debtor as someone about whom a case concerning has been filed. So it clearly tracks to this is our debtor, has to be the debtor, and no rights were modified even accepting that construction as a result of the commencement of the LBSF case. Could you address the opening clause of 560 about the exercise of any contractual right of any swap participant to cause the liquidation? Who is the swap participant here? That would be the issuer. So the issuer, so these were set up. You had LBSF entering into these swap agreements with a series of issuers, the so-called special purpose vehicles that my colleague referred to. And so that issuer, everyone agrees, is a party to the master agreement, the swap schedule, the confirmations, which then, of course, reference the indenture. Who exercised the contractual right? So then that issuer then had all those rights, and then it granted under the supplemental indenture, and you can find that language at A1639 to the trustee, all of its rights to enforce its obligations and its rights under the swap agreement. But the swap participant itself doesn't have to exercise the right in order for the safe harbor to apply. Correct, because the statute refers to the contractual rights of a swap participant, not exercised by a swap participant. And you see in the other safe harbors, and Merritt talks a little bit about this, that you do get into the of, by, to on behalf of all those words. But here the of tracks perfectly to what happened here. And so the only other point I'll get back to about the way we have a mismatch, about even the application of the anti-ipso facto provisions, the only way around that, and Judge Peck in the so-called BNY decision, what we refer to, that involved the Dante program, he had to rely on that singular event theory, which was to say Lehman Brothers, big, complicated bankruptcy, lots of entities, I'm going to treat the bankruptcy of, quote, Lehman as a singular event and treat the petition date for all those entities, and at least for LBHI and LBSF, as September 15th. The problem with that theory, and that saves him on the timing point and the language I just read about the debtor and the case. The problem with that, of course, is nothing in the bankruptcy code to support the singular event theory. Judge Peck himself abandoned it in another Lehman case involving Intel, which involved the automatic stay provisions and turnover. And Judge Chapman, in reviewing the rule, which, again, Judge Peck himself in the Bank of New York case acknowledged was novel, opened up a can of worms, really found that it was an untenable legal theory without any mooring in the plain language of the statutory text we were looking at and said that really doesn't work to fix this claim for the plaintiffs. And so for those three reasons, the district court should be affirmed. I think they acknowledge that once you find there's no anti-ipso facto problem, the state law claims fall away. And they say that explicitly for several of the claims in their brief. And so the dismissal of this case should be affirmed in all respects. Thank you. Thank you very much. Mr. DeFilippo, you have two minutes of rebuttal. Thank you, Your Honor. Flowing is no longer the rule under merit management. You look at the challenge conduct. The challenge conduct is the action of the trustees in liquidating the collateral and distributing the collateral proceeds to the note holders under the indenture. You close out the swap by terminating it and determining who owes what to whom. That eliminates the risk to the swap counterparties of fluctuations in the reference securities, which is the only risk that the swap counterparties have, that the reference securities which determine who owes what to whom may change over time. There is no reason for there to be a distribution of funds after the swap is terminated and the balance due is known to protect the swap counterparties. MSHDA distinguishes MSHDA. Doesn't that make the termination and liquidation, those terms, it would make liquidation superfluous, wouldn't it, under what you're just describing there? Not in a two-party. You don't need the word liquidation if the swap agreement is all about termination and nothing more. Not in a two-party swap. This was a much more complex, structured financial transaction. In a two-party swap, when the collateral is posted under the swap, then payment is okay. Then it's protected. That's what you had in Michigan housing. That's the difference between Michigan housing in this case. Two-party swap, liquidation was the termination of the proper payment regime. On the Type I and Type II deals, Your Honor, I know I'm talking fast, but I'm running out of time, the language used in those is indistinguishable unless and if not mean the exact same thing. There is no basis in the documents for that distinction. The tenant analogy that Mr. Bacuzzi referenced proves why modification does not happen until action is taken to distribute the funds because if a tenant goes into bankruptcy with an ipso facto clause in his lease and nothing happens, his rights are not modified. This is a mixed question of law and fact on a singular event, Your Honor, which Judge Crotty held in the Ballyrock Appeal, and we think it should be reversed on that basis. Thank you very much. We'll reserve decision.